**BALDWIN et al. v. DAVIS HILL OIL CO. et al.**

No. 4700.

Court of Civil Appeals of Texas. Beaumont.

Sept. 13, 1951.

Rehearing Denied Oct. 10, 1951.

Second Motion for Rehearing Denied Jan. 10, 1952.

Andrews, Kurth, Campbell & Bradley, Houston, for appellants.

Cleaves & Cleaves, and Murfee & Crystal, all of Houston, for appellees.

WALKER, Justice.

The action is in trespass to try title, by appellants against appellees and another, who disclaimed, to recover the title to and possession of two tracts of land in Liberty County. One tract, alleged by plaintiffs to cover 1380 acres, is situated in Leagues 6 and 9 of the 11 Leagues granted to Jose Maria Dolores Martinez on November 28, 1833; this tract extends across the western end of League 9 and into League 6, which adjoins League 9 on the south, for a distance of 1150 varas below the north line of League 6. The other tract, alleged by plaintiffs to cover 199 acres, is situated in League 9 to the east of the 1380 acre tract; its north line is the north line of League 9. Plaintiffs also sued all of the appellees except the Davis Hill Oil Company to recover the value of timber cut and removed from land by said appellees.

Appellees' pleadings need not be described.

Appellants will be referred to as plaintiffs, and appellees, as defendants.

The cause came on for trial before the court sitting with a jury. Both plaintiffs and defendants filed motions for an instructed verdict. Defendants' motion was granted and plaintiffs' was overruled; and the trial court rendered judgment that plaintiffs take nothing from defendants. From this judgment plaintiffs have appealed, assigning as error that none of the various grounds of the defendants' motion was valid.

For proof of title plaintiffs attempted to show that they held a superior title under a common source of title and the common source for which they contended was one Tom Moore. Plaintiffs' title under Moore is founded upon a deed dated May 10, 1905 from Moore to Tom M. Drew. Defendants also hold a chain of title under Moore which is founded upon a quit claim deed dated February 25, 1910 from F. B. Henderson, guardian of the estate of Tom Moore, to W. R. Wallace. Tom Moore was confined in the North Texas Hospital for the Insane, and his estate was under guardianship by Henderson, on the date of his deed to Drew. Defendants claimed title otherwise than under this deed but it is not necessary to discuss these other claims of title.

(1) A question is made as to the effect of Moore's guardianship, upon the validity of his deed to Drew. Defendants say that Moore's deed was void, or if not void, was in effect disaffirmed and set aside by the guardian's subsequent deed to Wallace. Plaintiffs say that Moore was sane when the deed was made; that, as a consequence, he had power to make a conveyance of land; and that his deed to Drew was valid and the guardian's subsequent deed to Wallace conveyed nothing.

Moore was found to be of "unsound mind," and was by the County Court of McLennan County, on June 16, 1892, adjudged a "lunatic" and ordered committed to the asylum at Terrell. This institution was then known as the North Texas Hospital for the Insane. The order does not state the cause of the mental condition. According to the record maintained at the Hospital, Moore had had one attack of "mania, acute," which lasted "five months," and the "alleged cause" of this attack was "abuse of narcotics."

This record showed that Moore was admitted to the hospital on January 21, 1892. He remained at the hospital until his death, on December 19, 1929. The superintendent of the hospital actually discharged Moore from confinement on December 2, 1916, and the County Court of McLennan County, on December 22, 1916, adjudged that Moore was restored to sound mind. Technically, Moore had the status of a patient, confined to the Hospital and subject to the control of the Hospital's officers, until he was discharged from confinement; but aft-

er his discharge, he was an employee of the institution. As a matter of fact, according to the testimony of Goodman, Moore began to work as a clerk in the office of the Storekeeper and Accountant of the Hospital at a time which must have been in 1900 and Moore continued to work in this office for the remainder of his life.

Two witnesses testified concerning Moore's condition and activities. Some references are made by the parties to a certificate contained in the "Statement of Facts" in Drew v. Baldwin; but this item, and, indeed, this "Statement of Facts," add nothing to the testimony of the two witnesses mentioned and need not therefore be discussed. One of the two witnesses, namely, Dr. Powell, had served at the Hospital as a physician from some date in January, 1900 until a date in 1911; at that time he became the superintendent of the Hospital, and he held that office until a date subsequent to Moore's death. He became acquainted with Moore "shortly after" he became a physician in January, 1900. Goodman, the other witness, began to work at the Hospital on October 15, 1894 as a druggist. He held this place for six years and then was appointed Storekeeper and Accountant of the Hospital; and he held this office until July 7, 1907. On that date he left the Hospital and entered private employment. Goodman became acquainted with Moore two or three years after he began to work as a druggist and he brought Moore into the Storekeeper's office to assist him there. Both Dr. Powell and Goodman were intimately acquainted with Moore, and both were qualified to know what Moore's mental condition was during the period of their acquaintance and thus, at the time of Moore's deed to Drew. Both men were friends of Moore and Dr. Powell was Moore's devisee.

According to the testimony of these men, Moore was perfectly sane on May 10, 1905, the date of Moore's deed to Drew, and had no abnormal weakness in, or limitation upon, his power of will except an addiction to drink; and it is apparent from the testimony of these men that Moore had been sane, although subject to this addiction, for a very long time prior to the date of Moore's deed to Drew, evidently at least from the time in 1900 when Moore began to work in the Storekeeper's office as a clerk. It is also apparent from the testimony of these men that Moore never relapsed into a condition of insanity and that any addiction he may ever have had to the use of narcotics was cured. However, prior to 1911, Moore did have an appetite for drink, which he either could not or would not control, and he would drink to excess, and into drunkenness, if he had an opportunity. This failing was known to Powell and Goodman, and doubtless to others at the hospital, and efforts, which were usually effective but sometimes were not, were made to deny Moore access to liquor. This state of affairs continued until a date in 1911 when Dr. Powell had a conversation with Moore which resulted in Moore's abstention from the use of liquor, or at least, from the excessive use of it. Dr. Powell testified: "I would say it was shortly after I first became superintendent. I called him into my office and told him I wanted him to have the privileges of others, but I wanted (him) to make it easy for me by not drinking. I told him when you go to town not to get to drinking. I thought he was going to rebel. And the rest of the time he was here, I never suspected that he had ever taken a drink at all."

Moore did not feel confident of his ability to re-enter active life outside of the Hospital, and neither did Dr. Powell. In substance, it seems that both men feared that if Moore left the Hospital his fondness for drink and the stresses and strains of life to which he would be subjected would cause him to revert to the habits which had lead to his being committed to the Hospital. Dr. Powell still felt this apprehension in 1916, but was of the opinion that he could not then have kept Moore in the Hospital against his will. Moore never manifested any desire to be discharged until the discharge was granted him in 1916, and he was impelled to request this by his kinsman Hill, who wanted this done in order to collect some money for Moore. Despite the discharge from confinement and the adjudication by the County Court of McLennan County,

Moore remained at the Hospital of his own choice, in the status of an employee. He was paid a salary of $25 a month, in addition to his meals and his room.

At least after the agreement of 1911 between Powell and Moore, which has been mentioned, the latter had the privilege of leaving the grounds of the Hospital at his will and unaccompanied. Dr. Powell said that he had no recollection of Moore's having such a privilege before this agreement was made. Goodman said, however, that Moore went out by himself and that the only restriction placed upon Moore was the requirement that he return to the Hospital not later than a certain time.

There is little competent evidence that Moore concerned himself about any property of his, and the indications are that property matters were brought to his attention by other persons. Moore was classed as an indigent patient and thus evidently had no income, or at least none of any consequence. However, there was evidence from Goodman that Moore knew that he owned property, and knew that he had a guardian. Dr. Powell had heard Moore refer to a Henderson, a relative of Moore's, but he had not observed anything which indicated that Moore knew of a guardian.

Henderson's application for guardianship of Moore's estate was granted by the County Court of McLennan County at the November term, 1902. Henderson's application alleged that Moore was "a person of unsound mind—now confined in the insane asylum at Terrell," and the order of appointment, in effect, recites the same facts. Moore had a son named D. D. Moore, but this son waived his right of appointment in favor of Henderson.

Various proceedings had in this guardianship were proved; and this evidence shows that the guardianship was not revoked and was active on the date of Moore's deed to Drew. Thus at the January term, 1903, the guardian applied to the County Court of McLennan County for authority to sell the land now in suit, alleging that the land was encumbered with taxes which the ward could not pay. An order

of sale was passed on March 2, 1903, and the guardian reported a sale made to Ayres. This sale was confirmed by an order of March 31, 1903.

The sale to Ayres was not completed. On June 26, 1903, Henderson filed an application to transfer the guardianship to Liberty County; and he alleged that Ayres had refused to complete the sale. The application alleged further that the guardian and the ward's only child resided in Liberty County and that the "greater part" of the ward's land was in Liberty County. The guardian's sureties consented to the removal of the guardianship by a document which was filed on July 28, 1903; and removal of the guardianship was ordered on September 8, 1903. These proceedings occurred in the County Court of McLennan County. A transcript of proceedings had in McLennan County was filed in Liberty County on December 10, 1903; and such subsequent proceedings as were proved were had in the County Court of Liberty County.

On July 23, 1905, after noting an approval upon the contract on May 10, 1905, (the date of Moore's deed to Drew), the County Court of Liberty County approved a contract dated April 29, 1905 between Henderson, as guardian, and one W. L. Thomas, whereby Thomas was employed to clear the title of the land in suit, for a consideration of one-half of the property recovered. Moore's deed to Drew of May 10, 1905 was made on the 11th day after the date of this contract and 44 days prior to the order approving the contract. The proof does not show what, if anything, Thomas did under this contract. In 1907, some two years later (the guardian's exhibit was sworn to on September 9, 1907) Henderson again applied for authority to sell the land, the only property of the estate, "for the maintenance" of the ward and "for the payment of attorney's fees." He alleged as a further reason that the title was in litigation. The exhibit attached to this application listed the land as the only item of property belonging to the estate and listed a claim against the estate by W. L. Thomas and two others, W. L. Bingle and C. F. Stevens, for one-half of

the value of the land, for "attorney's fees and services appertaining to said land." An order of sale was passed on October 19, 1907, and on the same day the guardian reported a sale of the land to W. L. Bingle. This sale was confirmed on October 25, 1907; but we infer that it was never completed, since the guardian later applied for and was granted authority to convey the land to Wallace. The record does not show when Henderson's application for authority to convey the land to Wallace was filed, but the conveyance was authorized by an order dated October 23, 1909, and Henderson's deed to Wallace was dated February 25, 1910. The order quoted the application verbatim and it is apparent from consideration of the application, of the order, and of the deed that Henderson was attempting to convey, and that the Probate Court had authorized him to convey such title as Moore had in the land when that court took jurisdiction of Moore's estate, and was not such title as Moore might have had after his deed to Drew. The consideration for the deed to Wallace was $2500, a substantial sum; and the ground for making the conveyance which the guardian alleged was the difficulty of establishing title in Moore against claims which were being exerted against Moore's title, none of which were made by Drew. The order of the Probate Court represents an exercise of that Court's power to authorize the guardian to compromise disputed claims involving the ward's property. Such a transaction shows an intent to transfer to Wallace the ward's full title.

The proceedings which we have listed are the only ones had in the guardianship of Moore's estate, other than some incidental to the guardian's qualification, which are shown by the proof. The evidence does not show when the guardianship was closed. According to the opinions filed in West Lumber Co. v. Henderson, Tex.Civ. App., 238 S.W. 710 and Tex.Com.App., 252 S.W. 1044, Henderson filed a suit in the ward's behalf in 1915 to recover land; and Moore, who was adjudged in 1916 to be restored to reason did not intervene in this case until 1918.

This proof may be summarized as tending to show these facts: (1) On the date of Moore's deed to Drew, Moore was sane. (2) However, he was, in law, a patient in the Hospital and was subject to confinement as such, and to the control of the officers of the Hospital. (3) Moore acquiesced in, and indeed desired this state of affairs, and there was a good reason for his attitude. (4) Moore's estate was under guardianship in Liberty County and this guardianship was active. (5) Moore knew of the guardianship and he probably had this knowledge when he made the deed to Drew.

There is nothing in the record which suggests that the guardian committed any fraud, or was guilty of any imposition upon his ward.

The effect of Moore's guardianship upon the validity of Moore's deed to Drew, and the existence, or not, of power in the Probate Court to disregard this deed and to direct the guardian to convey the land to Wallace depend upon the Articles of the Revised Statutes of 1895 now to be mentioned, which were in force at all relevant times.

Article 2593, R.S.1895, provided: "The guardian of a minor continues in office, unless sooner discharged according to law, until the minor arrives at the age of twenty-one years, or, being a female, marries, or until such minor shall die."

Article 2594, R.S.1895, provided: "The guardian of a person of unsound mind or an habitual drunkard shall continue in office, unless sooner discharged according to law, until the ward shall be restored to sound mind or to correct, sober habits, as the case may be, or shall die."

These statutes were Articles 2512 and 2513, R.S.1879. Earlier provisions of this sort had been made in (1) The Act of March 20, 1848, Sections 9 and 36, P.D. 3892 and 3919; (2) the Act of August 15, 1870, Sections 343 and 396, P.D. 6928 and 6981; (3) the Act of August 18, 1876, Sections 38 and 146. Also see Article 4128, R.S.1925, Vernon's Ann.Civ.St. art. 4128.

Article 2750, R.S.1895 provided: "If any person shall allege in writing and under

oath that a person who has been adjudged to be of unsound mind, or an habitual drunkard, has been restored to his right mind, or to correct, sober habits, as the case may be, the guardian of the person and of the estate of such ward shall be cited to appear before the county judge on a day and at a place named in such citation, either in term time or in vacation, and show cause why such ward should not be discharged from further guardianship, or the guardian may appear without such citation."

Article 2751, R.S.1895 provided: "If the fact of such alleged restoration be doubtful, the court shall, either in term time or in vacation, cause a qualified jury to be impaneled to try the issue as in the first instance, and if it be found by such jury that the ward has been restored to his right mind, or has reformed, he shall be discharged from guardianship by an order to that effect entered upon the minutes, and the guardian shall immediately settle his accounts and deliver up all the property remaining in his hands to such ward."

Article 2752, R.S.1895, provided: "If the fact of such alleged restoration be not doubtful, the court may, without the intervention of a jury, make the order discharging the ward from guardianship, as provided in the preceding article."

These three statutes were Articles 2668 to 2670, R.S.1879, and with some changes immaterial here appear in Articles 4282 to 4284, inclusive, R.S.1925, Vernon's Ann. Civ.St. arts. 4282 to 4284. Other statutes to accomplish the same purpose have been enacted but need not be stated. No provisions of this sort appeared in the Act of March 20, 1848. However, a procedure for declaring a restoration to sanity or to sober habits was prescribed in (1) The Act of August 15, 1870, Sections 405 and 406, P.D. 6990 and 6991; (2) the Act of August 18, 1876, Sections 183 and 184.

Article 2764, R.S.1895, provided: "When the ward dies, or if a minor arrives at the age of twenty-one years, or if a female marries, or if a person of unsound mind, or habitual drunkard, is restored *and discharged* from guardianship, the guardianship shall be immediately settled and closed and the guardian discharged, as provided in the following articles of this chapter."

This statute was Article 2682, R.S.1879, and such of its provisions as are material here are in Article 4296, R.S.1925, Vernon's Ann.Civ.St. art. 4296. The provisions of Article 2682, R.S.1879, differed from relevant sections of the Act of 1848. See Sections 31 and 36, P.D. 3914 and 3919, of the Act of March 20, 1848, and the provisions of that Act cited above. However, the Acts of 1870 and 1876 contained provisions similar to Article 2682, R.S. 1879. See (1) The Act of August 15, 1870, Sections 383, 406 and 407, P.D. 6968, 6991 and 6992; (2) The Act of August 18, 1876, Sections 133, 184 and 185.

In the case of the death of a ward, or the marriage of a female minor ward, or the accession of a minor to the age of twenty-one years (events mentioned in Art. 2593 as determining the guardian's "office", and in Art. 2764, the guardianship), it is held that the powers of the guardian and of the Probate Court over the ward's estate cease upon the occurrence of these events, excepting those powers which, in effect, are regarded as incidental to the proper settlement and closing of the guardianship; and this result has been arrived at under Section 343 of the Act of 1870, P.D. 6928 (the court's citation to P.D. 6929 is an error) and under Section 38 of the Act of 1876, which is exactly like Section 343 of the Act of 1870, without reference to the other provisions of those two Acts, cited above, which are similar to Article 2764, R.S.1895. See Timmins v. Bonner & Long, 58 Tex. 554, Parish v. Alston, 65 Tex. 194. For other decisions concerning the effect of the female ward's marriage, see Fort v. Fittes, 66 Tex. 593, 1 S.W. 563; Allen v. Stovall, 94 Tex. 618, 63 S.W. 863, 64 S.W. 777, referring to Article 2764, R.S. 1895; Carpenter v. Soloman, 4 Willson Civ.Cas.Ct. App. § 34, 14 S.W. 1074, citing only decisions but necessarily decided under the Act of 1876; Kretzschmar v. Peschel, Tex.Civ. App., 144 S.W. 1021, referring to Article 2764, R.S.1895. For decisions concerning *the effect of the minor ward's majority,* see Allen v Stovall, supra, Hix v. Duncan, Tex.Civ.App., 99 S.W. 422, citing Articles

2593 and 2764, R.S.1895; American Surety Co. v. Hardwick, Tex.Civ.App., 186 S.W. 105. In the case of the death of a ward who was insane, occurring after the guardian's sale but before the Probate Court confirmed the sale, it was held that the sale, which had been confirmed by the Probate Court and had been completed by a deed from the guardian, was absolutely void and that the orders of the Probate Court were subject to collateral attack. The sale occurred in 1909 and the governing statutes were the provisions of the Revised Statutes of 1895 which we have cited above. The court cites the provisions of Articles 4128 and 4296, R.S.1925, which appear in Articles 2594 and 2764, R.S.1895. Easterline v. Bean, 121 Tex. 327, 49 S.W.2d 427. For other decisions involving the effect of the death of the ward upon the guardianship, see the group of cases made up of Veal v. Fortson, 57 Tex. 482, Fortson v. Alford, 62 Tex. 576, and Alford v. Halbert, 74 Tex. 346, 12 S.W. 75; and also see Young v. Gray, 60 Tex. 541; Marlow v. Lacy, 68 Tex. 154, 2 S.W. 52; Carpenter v. Soloman, supra; Files v. Buie, 131 Tex. 19, 112 S.W.2d 714.

■ However, comparison of Articles 2593, 2594 and 2764, R.S.1895 shows that a material difference was made between the determination of the guardianships of estates of lunatics and drunkards on the one hand and guardianships of estates of minor wards on the other hand—the death of the ward being given the same effect in all instances. Thus Article 2593 provides that the guardian of a minor continues "in office" until the ward dies, becomes twenty-one years old, or being a female, marries. Article 2764 adds no other event for the determination of these guardianships; in effect, it provides only the same determining events, for it provides that upon the occurrence of the events which in Article 2593 are referred to as terminating the guardian's "office", the guardianship shall be "immediately settled and closed". However, in the case of a ward who is a lunatic or drunkard, Article 2764 adds a requirement, that is, a new determining event, which is not specified in Article 2594, the statute concerning the guardian's "office". It is provided in Article 2594 that the guardian of a lunatic or a drunkard continues "in office" until the ward is "restored to sound mind or to correct, sober habits", or dies. Except in the case of death the event determining the guardian's "office" is *restoration* to sanity or sobriety, and this statute was in form the equivalent of Article 2593. However, Article 2764 provides, not that the guardianship shall be terminated when the ward is "*restored* to sound mind or to correct, sober habits" but that it shall be settled and closed when the lunatic or drunkard is "restored *and* discharged from guardianship". In the case of the death of an insane ward, the guardian's duty under Article 2764 to settle and close the guardianship arises upon exactly the same event as it does when the ward is a minor; but if the insane ward is restored to sound mind (the event specified in Article 2594, R.S.1895 as determining the "office") the guardian's duty to settle and close the guardianship arises, not upon this event but upon the subsequent "discharge[d] from guardianship".

Since Articles 2750 to 2752, inclusive, R.S.1895, are the only statutes we have found which were in force and which provided a method for obtaining a "discharge[d] from guardianship" we infer that the discharge required in Article 2764, R.S.1895 as a prerequisite to the settlement and closing of the guardianship is that which is provided for in these statutes. There were statutes in force which authorized Moore's discharge from confinement at the Hospital, but these statutes are evidently not relevant. See Articles 94(3), 102 and 104, of Title IX, R.S.1895.

It was proved as a matter of law that Tom Moore was not discharged from guardianship prior to 1916. Thus, if he was sane on the date of his deed to Drew, it becomes necessary to determine the effect of the requirement, made in Article 2764, of the ward's discharge from guardianship before the guardianship was to be settled and closed.

The real question is whether the powers of the Probate Court to deal with the ward's

estate were suspended by the ward's restoration to sanity, during the period between the ward's restoration in fact and a judicial declaration of that restoration.

We have found no decision by the courts of this State construing the statutes which were in force at the times in question. The decision in Elston v. Jasper, 45 Tex. 409, on which the defendants rely, was decided under the Act of 1848, and as we have stated, this statute contained no provision like Article 2764. Further, we are not satisfied that the reasoning of the court in Elston v. Jasper is consistent with that followed in other decisions cited above.

The language of Article 2764, R.S.1895 indicates very strongly that the guardianship of a lunatic ward was not to be settled and closed, and thus, that the powers of the Probate Court relating to the ward's property, were not to be suspended until the ward had been discharged from guardianship as well as restored to sound mind.

Such a construction seems the only practical rule for the administration of the guardianship of an insane ward's estate. It is apparent that a declaration of restoration to sanity is not an automatic consequence of an application therefor. Both guardian and ward may believe that the ward should be discharged from guardianship and yet the Probate Court may be of a different opinion. For an illustration see Ferguson v. Ferguson, Tex.Civ.App., 128 S.W. 682. Injury to the ward and to the ward's estate might result if the Probate Court and the guardian did not have power to act between the time when the ward's apparent return to sanity became evident and the date of the order declaring the ward restored to sanity.

Furthermore, reasons exist for requiring a judicial declaration that the ward has been returned to sanity before the guardianship is to be terminated. Demonstration of this fact may well require expert opinion; the fact of restoration to sanity differs in character from the facts of death, marriage, and age, and is attended by certain inherent difficulties of proof which do not attach to the proof of these other facts. In a sense, a judicial investigation of a ward's return of sanity may be regarded as a part of the State's duty toward such persons necessary to be done for their protection; and we infer that the requirement in Article 2764, R.S.1895 of a discharge from guardianship as well as a restoration to sanity before the guardianship was to be settled and closed was made for the protection of the ward, since it directly tends to protect the ward's interest.

In a series of decisions by Courts of Civil appeals, it has been held that under Article 4296, R.S.1925, "discharge from guardianship" pursuant to Articles 4282 to 4284, inclusive, R.S.1925, had the same effect upon the guardian's powers as did the other determining events specified in Article 4296. See, John Schumacher State Bank v. Tschiedel, Tex.Civ.App., 92 S.W. 2d 571; Green v. Marsters, Tex.Civ.App., 79 S.W.2d 184; Tipton v. Tipton, Tex. Civ.App., 140 S.W.2d 865. It is a necessary implication from these judgments that *until* the "discharge[d] from guardianship", required by Article 2764, R.S.1895 was made, the determining event had not occurred and the powers of the Probate Court were not suspended. The relevant provisions of Article 4296, R.S.1925, are those of Article 2764, R.S.1895, and these decisions are authority for the construction of Article 2764, R.S.1895.

We conclude that the guardianship of Moore's estate was pending and active, and that the powers of the Probate Court over this estate were not suspended but were in existence, when Moore made his deed to Drew in 1905, when Henderson was authorized in 1909 to make his deed to Wallace, and when Henderson actually complied with the order of the Probate Court in February, 1910, by delivering this deed to Wallace; and since the guardian obviously had not abandoned his office, the Probate Court's jurisdiction to authorize the guardian to make the deed to Wallace was not limited or affected by Moore's restoration to sanity.

In so holding, we have given effect to Article 2764, R.S.1895; and the question arises, what effect shall be given Article 2594, R.S.1895, which provided that the

guardian of a lunatic should "continue in office" until (and therefore implied that he should not "continue in office" after) the ward was "restored to sound mind". It might be argued that the greatest effect which could be given this statute is that of a rule for the guidance of the guardian in the performance of his trust which did not, however, affect the jurisdiction of the Probate Court. If this construction be correct, it raises another question. The ward's deed to Drew was of record in the proper county when Henderson was authorized by the Probate Court to convey the land to Wallace. Did this deed charge Wallace and his successors in title with notice of Moore's sanity on the date of the deed and with notice of a possible breach of duty by the guardian? This question, and its antecedent, the effect to be given Article 2594, R.S.1895, need not be decided here. Under plaintiff's proof, the guardianship was actually in Moore's interest and as we have stated, Moore probably knew of the guardianship. But whether he did or not, Moore did not want to leave the Hospital and there was a good reason for his preference. He manifested no interest in obtaining a discharge from confinement until a third party caused him to do so in order to collect some money. Moore's property had to be managed by someone, and he could not do this himself until he was discharged from guardianship. The guardian could not be charged with a breach of trust on such proof as we have here.

■ Some discussion has been made of the question whether Moore's deed to Drew was absolutely void. This question also need not be determined. We hold that if Moore's deed to Drew conveyed any rights to Drew, the Probate Court's order authorizing the guardian's deed to Wallace, and the deed itself, had the legal effect of disaffirming Moore's deed to Drew. In the first place, the property was within the jurisdiction and under the control of the Probate Court on the date of this deed. The ward could not by his unilateral act withdraw his property from the jurisdiction of the Probate Court and he could not convey to Drew a greater right then he himself had. The greatest effect which could be given to the ward's deed to Drew is to construe it as putting Drew in the same relationship to the property as his grantor had; and since the Probate Court had power to divest the ward of title that court necessarily had power to divest Drew of title. This is the effect given a conveyance by an heir of property which is under administration. See Templeton v. Ferguson, 89 Tex. 47, at page 56, 33 S.W. 329. In the second place, the guardian's deed to Wallace was inconsistent with the ward's deed to Drew within the meaning of the rule stated in Teat v. Jones, 126 Tex. 480, 89 S.W.2d 987. We construe the order of the Probate Court authorizing the deed to Wallace, and the guardian's deed performing this order, as expressing an intention to convey to Wallace the interest of the ward of which the Probate Court had taken jurisdiction, and this interest was the full title of the ward in the land. As we have pointed out, the consideration paid by Wallace was a considerable sum of money and further, the purpose of the order and of the deed, namely, to effect a compromise, would not have been accomplished if the guardian's deed be construed as conveying only what chance of title the ward might have had after his deed to Drew. This distinguishes the case from Stuart v. Baker, 17 Tex. 417, at page 422, where the minors' subsequent quitclaim deed could be given effect without causing it to operate as a disaffirmance of his prior deed. The matter is really one of intention, and we think that the Probate Court intended an effective transaction.

■ Plaintiffs argue that the ward had legal title to the land and that his deed vested Drew with this title. They argue further that the Probate Court could not divest Drew's title and that the guardian had to bring a suit to set the deed aside. This rule of decision is not applicable to this case because the Probate Court acquired jurisdiction of the ward's estate before the ward undertook to convey the land to Drew. The guardian had listed the land in his inventory and the county court of McLennan County had authorized

its sale. Neal v. Holt, Tex.Civ.App., 69 S. W.2d 603 is an exemplification of the rule contended for by plaintiff; it is not in point because there the ward's deed was made before the guardianship was open.

Plaintiffs also argue for an application of the rule that a judgment convicting one of insanity creates a rebuttable presumption that this mental condition continues, and that upon proof of the convicted person's sanity at the date of his deed, the deed will be enforced. This rule has been applied in many cases where the estate of the ward was not under guardianship; but so far as we have been able to determine it has never been applied in this State against the guardian of the ward's estate in support of a deed made by the ward after the guardianship was opened. Smith v. Thornhill, Tex Com.App., 25 S.W.2d 597, contains some indefinite language which indicates that the rule contended for by plaintiff would be applied against the guardian in support of a deed made by the ward while the guardianship was pending, but the language is dicta. It seems to us that the rule contended for by plaintiffs is of no materiality here since the powers of the Probate Court relating to the ward's property were not suspended by the ward's restoration to sanity and the Probate Court accordingly had jurisdiction to exercise these powers. If the rule were applied it would not settle the effect of that jurisdiction. Whether the facts would support a direct attack upon the orders of the Probate Court is, of course, a question which is not before us; plaintiffs' suit is a collateral attack and must be disposed of accordingly.

(2) A question is made as to whether the county court of Liberty County had jurisdiction of the guardianship of Moore's estate when that court authorized the guardian to make the deed to Wallace. Plaintiffs argue that a certificate provided for by Article 2762, R.S.1895 was not filed in the county court of McLennan County until after the guardian made his deed to Wallace, and that this court did not lose jurisdiction of the guardianship, and the county court of Liberty County did not acquire jurisdiction of the guardianship, until this certificate was filed.

Articles 2758 to 2763, R.S.1895, Vernon's Ann.Civ.St. arts. 4290 to 4295, inclusive, governed the transfer of the guardianship from the county court of McLennan County to the county court of Liberty County.

Of these statutes, Article 2761 provided: "When such order of removal has been made the clerk shall record all papers of the guardianship required to be recorded, and that have not already been recorded, and shall make out a full and complete certified transcript of all the orders, decrees, judgments and proceedings in such guardianship, and upon the payment of his fees therefor shall transmit such transcript, together with all the original papers in the case, to the clerk of the county court of the county to which such guardianship has been removed."

Article 2762 provided: "The order removing a guardianship shall not take effect until the transcript provided for in the preceding article has been filed in the office of the clerk of the county court of the county to which such guardianship has been ordered removed, and until a certificate of that fact from the clerk filing the same, under his official seal, has been filed in the court making such order of removal."

As we have stated, the county court of McLennan County directed a removal of the guardianship to the county court of Liberty County by an order dated September 8, 1903; and a transcript of the proceedings had in McLennan County was filed in Liberty County on December 10, 1903. It was in 1909 that the guardian was authorized by the county court of Liberty County to make the deed to Wallace; and before that time, and after the transcript was filed in 1903, that court exercised jurisdiction over the ward's estate in other proceedings which we have listed above.

The evidence shows that a certificate containing the information called for by Article 2762, R.S.1895, dated December 20, 1915, was filed in the county court of McLennan County on December 22, 1915. The evidence does not show why this was done, nor at whose instance; and the evidence does not show whether some other certificate in the form prescribed by Article

2762, R.S.1895, either was or was not made by the County Clerk of Liberty County, and was or was not filed in the county court of McLennan County before the certificate of 1915 was made and was filed in McLennan County. We note that the certificate also recites that the guardianship had been under administration in Liberty County; but this recitation affords plaintiffs no aid.

The effect of plaintiffs' argument is that the certificate filed in 1915 is to be regarded as the only such certificate which was filed; that Article 2762, R.S.1895 must be construed literally; and that as a result, jurisdiction of the guardianship did not vest in the county court of Liberty County before December 22, 1915, the date when the certificate was filed in McLennan County.

Defendants say, among other arguments made by them in reply to plaintiffs, that this argument of plaintiffs, made in this suit, is a collateral attack upon an order of the county court of Liberty County; that if the filing of a certificate in McLennan County in compliance with Article 2762, R.S.1895, was a prerequisite to the vesting of jurisdiction over the guardianship in the county court of Liberty County, such a compliance with Article 2762, R.S. 1895 before the county court of Liberty County made the order attacked must be assumed.

We agree with the defendants. Whether the statutory certificate was filed or not before the county court of Liberty County made the order authorizing the deed to Wallace was a question of fact open to determination by that court and this suit (in trespass to try title) being a collateral attack upon that order, it will be assumed in support of that order that a certificate in proper form was filed in McLennan County before the county court of Liberty County made the order attacked— if this was a prerequisite to the transfer of jurisdiction of the guardianship. We think that the proof does not affirmatively show that this was not done; and the assumption is not unreasonable. Another certificate may very well have been filed and lost, and the certificate of 1915 may have been filed as a precaution, at the suggestion of one interested in another proceeding. The assumption made here is similar to those made in the following cases: Hardy v. Beaty, 84 Tex. 562, 19 S.W. 778; Templeton v. Ferguson, 89 Tex. 47, 33 S.W. 329; Jones v. Robb, 35 Tex. Civ.App. 263, 80 S.W. 395 at page 399; Frost v. Crockett, Tex.Civ.App., 109 S.W. 2d 529. For the general rules applicable in a case of this sort see, in addition to the decisions cited, the following: Guilford v. Love, 49 Tex. 715, at page 735 et seq.; Martin v. Robinson, 67 Tex. 368, 3 S.W. 550; Weems v. Masterson, 80 Tex. 45, 15 S.W. 590; Lyne v. Sanford, 82 Tex. 58, 19 S.W. 847; Bouldin v. Miller, 87 Tex. 359, 28 S.W. 940; Taffinder v. Merrell, 95 Tex. 95, 65 S.W. 177; Moore v. Hanscom, 101 Tex. 293, 106 S.W. 876, 108 S.W. 150; Carroll v. McLeod, 133 Tex. 571, 130 S.W.2d 277; Sloan v. Woods, Tex. Com.App., 25 S.W.2d 309; Berryman v. Biddle, 48 Tex.Civ.App. 624, 107 S.W. 922.

(3) A question is made as to the power of the county court of Liberty County to make an order of the sort by which that court authorized the guardian to convey the land to Wallace.

The guardian's application to the county court of Liberty County, so far as it is material, reads:

"Now comes F. B. Henderson, Guardian of Tom Moore, and respectfully represents that various and divers persons are asserting claims to the hereinafter described tract of land claimed by the Estate of Tom Moore, to-wit: (Description of land)."

"The above description is intended to include all right, title and claim of the estate of the said Tom Moore held by him under his father D. D. Moore, in and to all parts of Leagues Nos. 6 and 9, situated in Liberty County, Texas, originally granted to J. D. Martinez, which the said D. D. Moore may have claimed to have acquired title to by virtue of any transaction with or sale by the Administrator of Jos. Davis, deceased. That a litigation is now pending in the District Court of Liberty County, styled M. S. McCardell et al. v. Wright L. Collins et al. No. 3833, involving the title to the above described land in which

your petitioner, as Guardian, of the estate of said Tom Moore, is a Defendant.

"Your petitioner further represents that he claims the above described property by virtue of *of* a sale made by the administrator of Jos. Davis, Deceased, to D. D. Moore, the ancestor of the said Tom Moore about forty-eight (48) years ago, that the title under which the same is held for the said Tom Moore must depend upon the title held by the said Jos. Davis, that the title of the estate of Tom Moore is against the plaintiffs in said Cause No. 3833 pending in the District Court of Liberty County, above referred to, is attacked by the plaintiffs in said cause who are the heirs of the said Jos. Davis. That your petitioner has never been able to find any conveyance from the Administrator of said Jos. Davis to said D. D. Moore, and against the said Davis. Title is compelled to rely upon said orders of Court and circumstances to show the purchase of said property. That certain other parties to said suit who hold as heirs and devisees under William Hardin, deceased, are also disputing title to the said Tom Moore, and that in two preceeding litigations involving other parts of the same surveys of land which were held and claimed respectively and *aversely* by other persons under the said Davis and the said Hardin titles, to wit: in a cause finally adjudicated in the United States Circuit Court of Appeals at New Orleans it was held that the said Hardin title was superior to the said Davis title and in a cause which was adjudicated on appeal from the District Court of Harris County, Texas it was held by the Court of Civil Appeals at San Antonio, Texas that the Hardin title was superior to the Davis title. And that the statute of limitation in behalf of the Davis title could not be sufficiently interposed as against said Hardin title. Your petitioner further represents that W. R. Wallace, who has contracted to take over the said Hardin title to the above described tract of land is also acquiring title held by the plaintiffs in said cause No. 3833, above referred to,"

"Wherefore, your petitioner represents that he could not on account of the character of the title of the said Tom Moore and on account of the facts and circumstances set forth and of the previous adjudications with the respect to the title under which he holds exceptras Guardian of said estate to successfully prevail against said adverse claimants. Your petitioner further desires to say to the Court that he can adjust and compromise with one W. R. Wallace who is acquiring said adverse titles and who disputes the title of your petitioner, for consideration of Twenty-five Hundred ($2500.-00) Dollars in cash."

"Wherefore, he prays your Honor, that an order be entered authorizing him to compromise and adjust said adverse claim to said lands for the said consideration of Twenty-five Hundred ($2500.00) Dollars."

The proof does not show when this application was filed.

The order of the county court of Liberty County, dated October 23, 1909, granting this application, so far as it is material, reads: "And the Court, after hearing said application and the evidence in support of the same, finds that it will be for the interest of the Estate of Tom Moore to grant same.

It is further Ordered, Adjudged and Decreed that said Application be granted and that the said F. B. Henderson, Guardian of the Estate of Tom Moore, a non Compos Mentis, be and he is hereby authorized and directed to relinquish, assign and transfer to the said W. R. Wallace, all right, interest and claim of the estate of the said Tom Moore in and to the above described land, upon payment by the said W. R. Wallace of the sum of Twenty-five Hundred ($2500.-00) Dollars."

In February, 1910, the guardian made his deed to Wallace, which conveyed the ward's interest in the land in suit, referring in this deed to this order, which was attached to the deed, and reciting the payment to him of the $2500 which was the price he was authorized to receive from Wallace.

Plaintiffs say that this transaction was really a sale of the ward's land, a subject matter which was governed by the statutes regulating the sales of the ward's land; and that the conveyance was not made for

any purpose authorized by the statutes regulating sales. This is as far as their point of error (No. 5) goes, but in their argument they refer to circumstances which suggest that Wallace and the guardian awaited an adjudication of the claims of title made by the Hardin heirs, and that the deed was not delivered to Wallace until after the District Court of Liberty County had rendered judgment against these heirs. The probate proceedings do not show that Wallace had made a contract to buy the ward's interest and the implication is one of a breach of trust by the guardian. Plaintiffs' argument also suggests, as noted hereinafter, that the order attacked is not a compromise within the meaning of Article 1987, R.S.1895, Vernon's Ann.Civ.St. art. 3430.

Defendants argue, in reply, that the order attacked was an exercise of a power to make compromises or settlements in relation to property of the ward which was in dispute and litigation; that this power was conferred, and the method of its exercise was prescribed by Article 1987, R.S. 1895; and that the statutes regulating sales of the ward's land were not applicable. Defendants argue further that this suit being a collateral attack, the order attacked is not subject to review and the question, whether the Probate Court committed error under the facts in making the order is not in issue on this appeal.

We make the following holdings:

(a) Article 1987, R.S.1895 provided: "Whenever an executor or administrator may deem it for the interest of the estate he represents to purchase any property or to exchange any property, or take any claims or property for the use and benefit of the estate in payment of any debt due the estate, or to compound bad or doubtful debts due the estate, or to make compromises or settlements in relation to property or claims in dispute or litigation, it shall be his duty to present an application in writing to the county court, at a regular term thereof, representing the facts; and if the court upon the hearing of such application shall be satisfied that it will be for the interest of the estate to grant the same, an order to that effect shall be entered upon the minutes, setting forth fully the authority granted."

■ This statute was a part of Title XXXIX, which governed the administration of "Estates of Decedents." Guardianships were regulated by Title LI. Under the holding made in Browne v. Fidelity and Deposit Company, 98 Tex. 55, 80 S.W. 593, the provisions of this statute authorizing and regulating the making of compromises or settlements relating to property of a ward which is in dispute or litigation were made applicable to guardianships and thus, to the guardianship of Moore's estate, by Article 2558, R.S.1895, Vernon's Ann.Civ. St. art. 4108, which read: "The provisions, rules and regulations which govern estates of decedents shall apply to and govern such guardianships, whenever the same are applicable and not inconsistent with any of the provisions of this title." And see: Article 2742, R.S.1895, Vernon's Ann.Civ. St. art. 4274, which read: "All the provisions of this title relating to the guardianship of the persons and estates of minors shall apply to the guardianship of the persons and estates of persons of unsound mind and habitual drunkards, in so far as the same are applicable and not inconsistent with any provision of this chapter." We see no reason why the provisions of Article 1987, R.S.1895, authorizing compromises and settlements should not be made applicable to guardianships. The power to make compromises or settlements relating to the ward's estate is necessary to a proper administration of a guardianship; and the provisions of Article 1987, R.S.1895, authorizing settlements were not inconsistent with the provisions of Title LI, at least in any general sense. Title LI contained no statute pertaining to compromises, except perhaps in some minor detail.

We construe Article 1987, R.S.1895, as prescribing the only procedure by which the power to compromise is to be exercised. The sales statutes are not applicable.

■ (b) The guardian's application for authority to convey the ward's interest in the land to Wallace invoked the power of the county court of Liberty County, conferred by Article 1987, R.S.1895, to au-

thorize a compromise and settlement concerning property of the ward.

The application of the guardian alleges facts showing that the ward's title to the land was in litigation and was disputed on serious grounds.

For the reasons stated in Skidmore v. Cumberland Valley Land Company, 126 Ky. 576, 104 S.W. 390, by the Court of Appeals of Kentucky, we think that the power to make compromises and settlements conferred by Article 1987, R.S.1895 included the power to convey the ward's lands in return for a consideration payable in money. There is no real inconsistency between such a power and the power to sell the ward's lands. Without this, the power to compromise might well prove incomplete and ineffective, as the Court of Appeals noted in Skidmore v. Cumberland Valley Land Company, supra; and there is adequate provision for review of any misuse of the power.

We construe the guardian's application and the order of the Probate Court as expressing an intent to make a compromise and settlement as distinguished from ια sale.

 (c) Plaintiffs seem to say that the order attacked was not a compliance with Article 1987, R.S.1895, because, they say, Wallace was not a party to the litigation or the dispute involving the ward's title. The argument actually raises the question, whether the transaction authorized by the Probate Court was in fact a compromise and settlement or was one only in form, the transaction really being a sale, involving a perversion of the power to compromise. The application certainly authorized the Probate Court to find that a compromise was intended, and it contains allegations which authorized that court to find that Wallace had acquired such rights in the claims of the persons who were disputing the ward's title that he had become an adverse claimant himself, and thus, a party to the dispute and to the litigation. On collateral attack, such a finding would have to be assumed if it was necessary to the support of the order.

 (d) The circumstances in proof do not show that the guardian committed a breach of trust by waiting until the adverse claims on which his application for authority to make the compromise was based had been adjudicated in favor of his ward and against the parties whose claims Wallace was acquiring. For one thing, the application alleges as one of the grounds for compromise that the ward claimed title under Davis and that Davis' heirs were disputing the ward's title. It does not appear that the guardian awaited determination of this claim. Of course, whether the Probate Court was right in finding that the claims by the heirs of Davis were serious enough to justify a compromise is not reviewable in this suit, and the terms of the Probate Court's order do not exclude the adverse claim of the Davis heirs from the possible grounds supporting the order. There is no reason why the guardian's deed should not be referred to this claim, if necessary.

(4) Plaintiffs argue that the guardian's deed to Wallace was not effective because no order confirming it was made by the county court of Liberty County. This argument seems to be an incident of their contention that the conveyance to Wallace was a sale and was governed by the statutes regulating sales of the ward's land.

 As we have stated, Article 1987, R.S.1895, was the governing statute. It does not provide for a report to the county court by the guardian, and it does not provide for an order confirming or approving the action taken by the guardian pursuant to an order granting him permission to make a compromise or settlement; and we have found no other statute which provides for such a report or confirmation in such a case. We conclude that the Probate Court was not expected to take any action regarding the compromise or settlement after making an order authorizing the compromise; and we hold that none was necessary. In Ulrich v. Hoelfling, 23 Tex.Civ.App. 289, 56 S.W. 199, the Court of Civil Appeals gave effect to a compromise which was supported only by an order authorizing it. The order was

made in 1899. The point was not discussed but the court evidently assumed that no other order by the Probate Court was necessary.

As a matter of fact, there was nothing for Moore's guardian to report to the Probate Court except Wallace's payment of the price to him and his delivery of a deed to Wallace; and a report of such matters, and an approval of such actions, is not even required in the case of a sale of land. It seems to us that the order provided for in Article 1987, R.S.1895 is the equivalent of, and that it performs the same function as, the order of confirmation in the case of a sale.

The order of the county court of Liberty County was sufficiently specific regarding the guardian's authority, and the guardian's deed complied with the order.

These comments determine the appeal; for as a consequence it appears that Tom Moore's title was conveyed to Wallace and that the plaintiffs hold no title under Moore. The Points of Error involved in the comments stated above are overruled; other points of error are immaterial and need not be discussed.

The judgment of the trial court is affirmed.

On Motion For Rehearing.

Plaintiffs' motion for rehearing has been considered and it is overruled.

■ Plaintiffs say that our construction of Article 1987, R.S.1895, as authorizing the probate court to make the conveyance to Wallace deprives the ward of the protection of the statutes requiring an additional bond from the guardian when he sells the ward's land, but this argument does not take into account the fact that the statutes concerning guardian's bonds have been materially changed since the conveyance was made to Wallace. Under the statutes in force when the probate court authorized the conveyance to Wallace and when the guardian made his deed to Wallace, no additional bond was required from the guardian when he sold the ward's land, and the ward had exactly the same protection against loss of the money paid the guardian by Wallace as he would have had

against loss of money paid the guardian upon a sale of the ward's land. In both instances, the only bond required was the guardian's general bond. See Articles 2600, 2660 and 2675, R.S.1895, which became Articles 4099, 4162 and 4177, R.S.1911. These Articles were amended in 1913, and by this amendment the amount of the guardian's general bond was reduced and the guardian was required to furnish an additional bond when he sold the ward's land. See Chapter 151, General Laws, Acts of 1913, p. 321; Vernon's Ann.Civ.St. arts. 4141, 4201, 4216.