### HARRY BENNETT V. ADOLFO C. ROMOS ET UX

No. A-3492. Decided October 15, 1952.
Rehearing overruled November 26, 1952.
(252 S. W., 2d Series, 442.)

512

*Erwin G. Ernst,* of Lamesa, and *N. C. Outlaw,* of Post, for petitioner.

The Court of Civil Appeals erred in holding that respondents, Romos and wife, were not unknown owners of the land in question at the time of the tax suit and rendition of the judgment therein. Berkeley v. Neely, 6 S.W. 2d 430; Shear Co. v. Lucas, 276 S.W. 935; Patton v. Minor, 103 Texas 176, 125 S. W. 6.

*Ratliff, Conner & Walker* and *A. W. Walker,* all of Spur, for respondents.

Even though respondents were nonrecord owners at the time of the tax suits, they were not made parties to the tax suit under the designation "Unknown owners." Underwood v. Pigman, 32 S.W. 2d 1102; Milam Building Co. v. Dannelley, 57 S.W. 2d 345; Williams v. South Texas Dev. Co., 138 S.W. 2d 605.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

The petitioner, Harry Bennett, who was a defendant below, complains here of the judgment of both courts below in favor of the respondent-plaintiffs, Adolfo Romos and wife, in a trespass to try title action involving land in Clairemont, Kent County, and tried without a jury. The trial court filed conclusions of law but no particularized fact findings. The opinion of the Court of Civil Appeals is reported in 246 S. W. 2d at page 328.

The common source is Juan Nebarez, Navarez, or Navarey (the difference in names being immaterial under the stipulation of facts) who acquired the land by duly recorded deed from "Bill" Underwood of March 30, 1934. The hereinafter mentioned conveyance or conveyances of the Nebarez title to the

respondents Romos establish their ownership but for a judicial tax foreclosure of 1947 in Cause No. 2588A in the 39th District Court of Kent County, under which petitioner Bennett claims as purchaser from the purchaser at the foreclosure sale.

Nebarez, when he acquired the land in 1934, was married and, oddly enough, under adjudication of insanity, which continued in effect until, on May 30, 1950, he was adjudicated to be sane again. His wife dying intestate in 1935, her community half passed to their seven children (including respondent, Mrs. Natibidad Nebarez Romos) as tenants in common with Nebarez. The record reflects a deed of May 30, 1950 from Nebarez and his co-tenant children (other than respondent Mrs. Romos) to both respondents, containing the following significant recital:

"* * * in consideration of the sum of ten and no/100 dollars * * * and in lieu of a deed executed by us in the year 1944 by the terms and provisions of which the hereinafter described real estate was conveyed by us to the grantees herein and which said deed has been lost and does not now appear of record in the Deed Records of Kent County, Texas, and for the purpose of supplying a record of said lost deed, have granted," etc., etc.

The lost 1944 deed, if any, was, of course, executed while Nebarez was under adjudication of insanity and after the children had become his cotenants. There is no reference whatever to it in the record other than the recital just quoted. The so-called substitute or confirmation deed (1950) was made on the date the sanity of Nebarez was restored, but some three years after the 1947 tax foreclosure under which petitioner Bennett claims, and just under two months before the filing of the present suit. At the time of the tax suit, Nebarez was obviously the last grantee of the land indicated by the deed records (by reason of the recorded deed into him of March 30, 1934) although the taxes in question, which were state and county taxes for the years 1931 through 1945, were all assessed against W. R., or "Bill", Underwood, the grantor in the deed mentioned.

So far as relevant here, the only defendants in the tax suit were "The Unknown Heirs of Juan Navarey, Deceased, whose residences are unknown. * * * And all unknown owners, and the heirs, administrators and legal representatives of all such unknown owners and of all such above named defendants whose residences are unknown". Accordingly, neither the "record owner," Nebarez, who was then and still is living, nor any of

his children nor the respondents, Romos, were sued by name or personally served with process.

The attorney who brought the suit (on behalf of the state, Kent County, and "all political subdivisions whose taxes are collected by the Assessor and Collector of Taxes for the said Kent County") filed his affidavit for substituted service, stating that "the defendants herein named as unknown in said cause are unknown to affiant, and after diligent inquiry cannot be ascertained; that the defendants whose residences are hereinafter named as unknown are unknown to affiant, and after diligent inquiry cannot be ascertained;" the document thereafter listing "The Unknown Heirs of Juan Navarey, and the Unknown owner or owners, all of whose residences are unknown."

It is stipulated that at the time of filing the suit, the tax attorney "made inquiry around the town of Clairemont and believed the said Juan Nebarez to then be deceased, such belief being based upon such inquiry" (albeit erroneously).

The citation, which was properly executed by posting in the absence of publication media, and all subsequent steps in the foreclosure and sale made reference to the defendants in the suit in a manner corresponding to the references in the petition. None of them nor any of the Nebarez family nor the respondents, Romos, appeared at any stage, though an attorney *ad litem* for such defendants as the citation might be said to include was appointed by order, reciting default on their part, and filed a general denial on their behalf.

The required statement of facts filed in the tax proceeding, agreed to by the attorneys and approved by the judge, contained the statement, "2. That the residence and whereabouts of defendants The Unknown Heirs of Juan Navarey, and the unknown owner or owners, are unknown, and after diligent search and inquiry by the attorneys bringing this suit could not be ascertained, whereupon said defendants were duly and legally cited by publication." The foreclosure judgment recites that the defendants thus described, "though duly cited, failed to appear and answer in this behalf, but wholly made default."

1 Obviously the one general question before us is whether the courts below were right or wrong in holding the tax foreclosure and sale not to have transferred any interest in the land to the purchaser under whom petitioner, Bennett, holds. As disclosed

by the "Points of Error" in his petition, petitioner now contests that holding exclusively upon the theory that the foreclosure proceeding named as defendants the "unknown owners" (as well as the "Unknown Heirs of" the supposedly deceased Nebarez), and that at the time of the foreclosure (1947) the respondents, Romos, were in fact the owners of the premises by reason of the lost and unrecorded 1944 deed to them abovementioned, so that the title passed from them as "unknown owners" to the foreclosure purchaser some three years before the 1950 deed to them was made. Undoubtedly in 1944 and thereafter respondent Mrs. Romos, a child of Mr. and Mrs. Nebarez, owned a 1/14th interest by inheritance from her mother, if not by other means. The petitioner contends, however, that by reason of the lost deed (in which the grantors were Nabarez as surviving husband and the other six children as heirs of their mother) respondents in 1947 owned the full interest.

That the loss or destruction of a valid deed does not reverse or invalidate the transfer of title made by the deed is, of course, well settled. See cases collected in 14 Tex. Jur., "Deeds", Sec. 121, p. 898.

Disregarding for the moment the 1/14th inherited interest of respondent, Mrs. Romos, petitioner's contention assumes the recital in the 1950 deed to establish that the 1944 conveyance was actually made. Since the trial court held against petitioner, it must be taken to have held or found against this view. Assuming the question to be one of fact, and if there were evidence pro and con, we could not disturb the implied finding. But the recital is, as heretofore indicated, the only thing in the record in the way of proof on the point, and the trial court in effect went against this uncontradicted proof. The respondents say in this connection that the recital does not estop them to deny the earlier deed and is essentially no more than hearsay evidence which would not have supported a judgment for petitioner even had the trial court held for him instead of for respondents. Our conclusion is that, aside from the matter of estoppel, the position of the respondents is wrong and that of the petitioner well taken.

2    Respondents, evidently in proof of their title, introduced the 1950 deed. Obviously they were as much parties to the recital in it as they were to the granting clause. The recital says the purpose of the 1950 deed was to supply a record of the 1944 deed which had been lost but which "conveyed" the land

from the same grantors to the respondents. The latter thus put in evidence their own declaration that the 1944 conveyance was made. In Illg v. Garcia, 92 Texas 251, 257; 47 S. W. 717, 718, the opinion, after declaring that the plaintiffs, as strangers to a partition deed between one Gutierrez and the defendant, could not invoke it to estop the defendant, adds—"but could only use it as evidence, just as * * * any other declaration made by Gutierrez while in possession explanatory * * * of his holding." The general rule that any material statement is evidence of the fact stated against the maker in a suit to which he is a party (McCormick & Ray, Texas Law of Evidence, Sec. 505) should apply no less forcibly to admissions in a solemn instrument such as a deed. In Peurifoy v. Wiebusch, 132 Texas 36, 117 S. W. 2d 773, the recital of payment of the mortgage notes in a release executed by the mortgagee, Wiebusch, was held to make a fact issue of such payment in favor of Peurifoy, a stranger to the instrument, despite the otherwise uncontradicted testimony of Wiebusch that the release was a mere sham to aid the mortgagor in an abortive attempt to sell the land. The holding was reaffirmed in Simonds v. Stanolind Oil & Gas Co., 134 Texas 332, 114 S.W. 2d 226, 136 S. W. 2d 207, 209. The latter, written by the same judge, decides that an impressive mass of evidence that one McGeorge was a nonresident of Texas, justified withdrawing the residence issue from the jury, despite presence in the record of a deed to McGeorge, in which his name was followed by the words "of Dallas County," but it distinguishes the Peurifoy decision on the ground that the recital of payment there involved was one of considerably more dignity than the more or less formal and incidental recital of the residence of a grantee in a deed, which at most was "prima facie" proof that could be completely destroyed by adequate contrary evidence. The recital in the instant case obviously resembles that in the Peurifoy case far more than that in the Simonds case. In Thornell v. Missouri State Life Ins. Co., Tex. Com. App. 249 S. W. 203, 208, which was a suit on a life insurance policy by the beneficiary,[2] the plaintiff had previously made proof of death by affidavit, including a medical report and coroner's report, each of which contained a conclusion that the insured had committed suicide. On the critical issue of suicide, these conclusions of persons, not parties to or witnesses in the suit, were held properly received in evidence against the plaintiff as her admissions or "admissions by adoption." In that case the admissions in question were introduced against the plaintiff by the defendant, but they would seem to have been no less evidence, of which the defendant might properly take advantage, if, as in the instant case, the plaintiff her-

self had introduced them. If the mere conclusion of a stranger to the suit may thus become evidence of a fact in issue, is not the plain statement of fact made in the recital by the respondents themselves, evidence and good evidence in the instant case that the 1944 deed did exist? So the trial court had such evidence before him, uncontradicted and unexplained by anything in the record and introduced without reservation by its very authors. As a matter of law, it required his conclusion, as it does our own, that the conveyance was made. He could not ignore it; and if it be urged that he might disbelieve it, that is, consider the recital to be false instead of true, there is yet no ground, except pure speculation, on which he might have so considered it. If such an unqualified admission had come from respondents on the witness stand, instead of from their deed which they introduced, it would undoubtedly be controlling under the circumstances. There seems little practical difference between the two situations. It may be noted in passing, that the Court of Civil Appeals, on rehearing, said, "It can be presumed according to the record that the fact that Juan Nebarez was a person of unsound mind during the year 1944 was one of the principal reasons the latter deed" (1950) "was executed in lieu of the former deed"; (1944). 246 S.W. 2d 328,332. This is as much as saying that there was a 1944 deed.

Against our view that respondents were concluded by the tax foreclosure as unknown owners sued therein, it is urged that the point was made for the first time in the Court of Civil Appeals and was therefore waived. There is no particular evidence that it was raised in the trial court, since it did not have to be specially pleaded, nor was there a jury so that fact issues requested or submitted might indicate one way or another. However, the answer of petitioner Bennett in the present suit does point out that the tax foreclosure included "unknown persons" as defendants (in addition to the nonexistent unknown heirs of Juan Nebarez) and, as before stated, the entire foreclosure proceedings made adequate reference to "unknown owners". And there is certainly no greater evidence that the point was *not* raised. The stipulation that Nebarez was under adjudication of insanity between 1934 and 1950 is shown by its own terms to have been made at the behest of respondents and logically seems to have been inserted for the very purpose of combating the point of the 1944 ownership of respondents—on the theory (apparently held by the Court of Civil Appeals) that the 1944 conveyance was in fact made, but was void because Nebarez was then insane. The memorandum of law submitted

by petitioner to the trial judge is not part of the record and, even if it were, does not by its mere omission of the specific point in question prove that the latter was not suggested to the judge in some other manner. The question was rather obvious from the 1950 deed of Nebarez and the children to respondents, which, as stated, was executed less than two months prior to the present suit and which respondents presumably had in their possession until they introduced it to prove their title. There would be little prejudice to them in any case in having to meet it for the first time on appeal. It is not a very appealing argument to say now that if the petitioner had urged such an obvious point on the trial judge, the respondents might have then produced evidence that the solemn and recent recital of purpose in their deed was in fact false. If it was false, they must have known it, and yet they introduced it without reservation. If the petitioner did fail to disclose all of his ideas, the respondents were not greatly less reticent.

3  The failure of the tax suit to include as a defendant, Nebarez, who appeared as the latest grantee on the deed records and was erroneously thought by the tax attorney to be dead, does not vitiate the foreclosure as to respondents, who were then nonrecord owners and sued under the general description of "unknown owners". Decisions such as American Realty Corp. v. Tinkler, Tex. Civ. App., 107 S.W. 2d 627, error refused, holding that the "record owner" must be made a party under Art. 7328, R. S. 1925, refer only to situations in which such "owner" is in fact the real owner at the time. Obviously such an owner is not "unknown", as was properly held in Scales v. Wren, 103 Texas 304, 127 S.W. 164 and later cases and as Art. 7345b, Vernon's Tex. Civ. Stats. Ann., under which the instant foreclosure was held, clearly provides. See also Rule 117a Tex. Rules Civ. Proc. But there is no provision or decision that requires the last grantee shown on the deed records to be joined, when the real owners are unknown and not of record. Conceivably our courts are committed to view with a hostile eye the process of forcibly collecting taxes even where, as here, they have been left unpaid (and without rendition of the property) for some fourteen consecutive years just preceding the foreclosure, while other property owners have been meanwhile carrying their full part of the tax burden. It could possibly be that the unfortunate Mr. Nebarez and his children were actually the owners until 1950, and that the recital in the 1950 deed was thus but an extrordinary mistake or even a deliberate misrepresentation to circumvent a fore-

closure, which was erroneously thought to bind Nebarez and the children. But when we are asked to apply the rigors of the law to those who purchase under tax foreclosures (often paying substantial value, as petitioner evidently did here) we may properly feel small compunction in taking the tax defaulters or their grantees at their own word and certainly may decline to read into the statutes provisions for their benefit not otherwise existing.

4 It does not, indeed, appear affirmatively from the evidence that the respondents in 1947 were out of possession and otherwise unidentifiable as actual, if unrecorded, owners. But considering the recitals in the tax proceedings and the fact that respondents then actually owned the property by reason of an unrecorded deed, the foreclosure judgment created at least a presumption in this collateral proceeding that such unrecorded ownership was unknown in every respect. Being unrecorded owners, respondents needed, at least, to produce evidence that their ownership was otherwise ascertainable by the tax attorney through reasonable inquiry. In Hume v. Carpenter, Tex. Civ. App. 188 S.W. 707, 710, error refused, a title suit involving a tax foreclosure had under Art. 7698, Vernon's Sayles Tex. Civ. Stats., Vernon's Ann. Civ. St., Art. 7342, against "unknown owners", the court sustained the attack on the foreclosure by a party, who was both actual and record owner, but said:

"While the petitioner in the tax suit against the unknown owner was duly attested by the assistant county attorney, as required by the statute above cited, still, this was not conclusive evidence of the fact that the owner was unknown; and in a a suit of this character by the owner to recover the land he has the right to raise this issue, and show by competent evidence that, by the exercise of reasonable diligence, the county attorney could have ascertained his ownership of the land before the institution of the tax proceedings, and if this is done to the satisfaction of the jury, then and in that event, the judgment in the tax proceeding and the sheriff's deed based thereon would be nullities, and no title could be acquired by virtue thereof."

The inference is clear that the owner at the time of the tax foreclosure, is bound by the latter in a collateral suit unless he affirmatively shows by proof from the records or otherwise that his ownership was not truly unknown.

5 Another argument of respondents in support of their judgment is that under the applicable statute [Art. 7345b, supra,

§ 3(a)], they were expressly excluded as "unknown owners" because their title, if any, under the 1944 deed was clearly acquired less than five years before the foreclosure (1947). The mentioned portion of the statute states first (in substance) that a foreclosure against "unknown owners" is proper, where the names of the owner or owners are unknown to the attorney for the plaintiff taxing unit, and then says:

"provided, however, that record owners of the property * * * shall not be included in the designation of 'unknown owners'; *and persons within a period of five (5) years next preceding the filing of the suit, shall not be included* in the designation of 'unknown owners' ".

The provision which we have italicized is, of course, the one relied on and is clearly unintelligible as written, because there can be no such persons as "persons within a period of five (5) years * * *." There can only be persons who did or were something during the period. That the provision was apparently written with the idea of making some limitation on the use of the "unknown owner" practice, does not authorize a court to supply a particular limitation which it might consider desirable and accordingly attribute to legislative intent. The legislative history of Art. 7345b throws no light whatever on the matter. The actual purpose could, indeed, have been "persons who have acquired title within five years of the tax suit shall not be deemed unknown owners." Equally well it might have been "persons who have rendered the property for taxation within five years * * *", or perhaps, "persons who have been in possession within five years * * *." The two latter interpretations might have a reasonable result in practice, though they would not help the respondent, who could not qualify under them. The former would have the perhaps undesirable effect of permitting an owner already in default for several years to default safely for five years more by conveying to his wife or a friend who will not record the deed nor pay taxes. Our duty of great diligence in seeking a valid legislative intent does yet not require us to legislate ourselves. We cannot say that the statute excludes the respondents from being "unknown owners."

6 As to the point of the mental capacity of Nebarez at the time he joined with his children in the 1944 deed to respondents, this can have no conceivable effect, of course, except as to the half interest which was all that he owned at the time. The stipulation of facts recites merely that he was adjudicated insane by a particular decree of the County Court of Kent County (where

the land is located) and later "restored to the status of a person of sound mind" by decree of the same court entered on the very day the 1950 deed to respondents was executed. There is no direct reference in the case to the matter of when he regained his sanity in fact as distinguished from the corresponding adjudication, though, clearly enough, he must have been actually of sound mind at some undisclosed time before the 1950 decree, despite the presumption of continuance of a once established status. An incompetent obviously does not often regain his sanity in fact at the very moment the corresponding decree is being signed or even drafted. Assuming, however, that the stipulation establishes incompetency in fact in 1944—eleven years after the original adjudication—this fact does not, as the Court of Civil Appeals seems to have thought, render the 1944 deed void even as to the Nebarez half interest. The title passed to respondents, subject to the right of the incompetent grantor, his heir or personal representative, but not his grantee ,to set it aside in a proper proceeding brought for the purpose. Neill v. Pure Oil Co., Tex. Civ. App., 101 S.W. 2d 402, error refused; Porter v. Brooks, Tex. Civ. App., 159 S.W 192, error refused. The instant proceeding is clearly collateral.

The respondents themselves do not, in this court at least, contend the 1944 deed to have been void. Rather, they say that it was voidable but "avoided" (disaffirmed) by the 1950 deed which was evidently identical with the former, except for the recital heretofore discussed. As to this point, it is enough to say that the full text of the 1950 instrument, including the expressions, "was conveyed by us to the grantees herein" and "for the purpose of supplying a record of said lost deed," does not admit of a purpose to retroactively cancel the earlier deed between the very same parties, despite the further inclusion of the single phrase "in lieu of." No reference whatever is made to the one circumstance that might conceivably justify a disaffirmance—the insanity of Nebarez—and the emphasis is all on the circumstance that the 1944 deed had been "lost." If a secret purpose of disaffirmance had in good faith existed, the natural way to have accomplished it would have been merely to let the lost deed remain lost instead of "supplying a record of" it.

7   Nor is there any ground in the record for us to take the position that the deed of an incompetent is wholly void where there is an active guardianship, and to dispose of this phase of the case on a voluntary assumption that there might have been a guardian in 1944, who might have been active at that time. In

the first place, our Texas courts have never held one way or another on the broad legal proposition mentioned.. Elston v. Jasper, 45 Texas 409, held that, where the guardianship existed but was inactive, a bond for title executed by the ward might be specifically enforced, and several expressions in the opinion (e.g. "* * * and his deed, as against his guardian, is absolutely void") suggest that the ward's deed is not void except as it may happen to conflict with the actual exercise of the guardian's authority. Indeed, even in the latter situation, one of our Courts of Civil Appeals in Baldwin v. Davis Hill Oil Co., 245 S.W. 2d 353, 362 had merely this to say:

"Some discussion has been made of the question whether Moore's deed to Drew was absolutely void. This question also need not be determined. We hold that if Moore's deed to Drew conveyed any rights to Drew, the Probate Court's order authorizing the guardian's deed to Wallace, and the deed itself, had the legal effect of disaffirming Moore's deed to Drew."

Clearly the instant case can involve no conflict between the 1944 deed and some deed or other act of the hypothetical guardian. But be this as it may, the stipulation of facts before us agrees "* * * that the following constitute the facts in this case, except the documents to be introduced in evidence," and neither the recited facts nor the documents anywhere mention the existence of a guardian, active or inactive. When respondents thus expressly undertake to set out all the facts of interest to them, and the terms of the stipulation disclose that they must have examined in detail the record of both adjudications, would it not approach the officious for us to suggest that they made what is a negligent oversight if it be true that the existence of a guardianship has substantial bearing on the case? There is no presumption or guardianship from the mere recited fact of adjudication or insanity, and lawyers rarely rely on mere presumptions to state matters of importance to them, when it would be quite as easy to state the facts themselves. And other items of the record affirmatively suggest that there was no guardianship, and particularly no active one. Though the original adjudication occurred in 1933, the deed of the land in suit from Underwood to Nebarez about a year later ran to Nebarez, and not to a guardian. The very fact that the 1944 deed was executed by Nebarez himself (along with his children) and not by a guardian is also significant. So also is the fact that by 1944, some thirteen consecutive years of taxes had been allowed to accumulate, which would hardly have been the case, where the land was located in the very county in which the supposed guardianship

would have been administered. So also is the failure of the supposed guardian to appear for any purpose in the 1947 foreclosure, which—assuming he had not consented to the 1944 deed—would have been of at least some interest to him. Undoubtedly the record does not permit us to hold, even did the decisions so justify, that the 1944 deed was a nullity because an active guardianship then existed— and thus affirm the result below as to the Nebarez half interest. Nor can we say that even a fact issue was raised on the point. Nor do the circumstances warrant us in sending this arm of the case back for a new trial, with the idea that new facts may be developed, which the interested parties themselves have not even suggested, which apparently do not exist and which might well not make any difference, if they should exist.

**8** The parties rightly appear to attach little importance to the aforementioned fact that respondent, Mrs. Romos, since 1935, owned, in her separate right, a one-fourteenth interest by inheritance from her mother, Mrs. Nebarez, the remaining thirteen-fourteenths being what passed under the 1944 deed to both respondents. Even assuming that ordinarily an heir of an interest in the community half of a parent not appearing in any manner on the deed records, should be sued as an "unknown heir" rather than "unknown owner," it would yet seem unreasonable to require such heir of an undivided interest to be sued in both capacities, where she is also an owner by grant of an additional and much larger interest in the same land.

The judgments of both courts below are reversed and judgment is here rendered that the respondents, Romos and wife, plaintiffs below, take nothing.

Opinion delivered October 15, 1952.

MR. JUSTICE SMITH joined by JUSTICE SHARP dissenting.

The majority opinion correctly decides that the one-half interest owned by the children of Juan Nebarez passed under 1944 deed, and that the cause should be reversed and rendered to that extent. However, I disagree with the majority opinion as to the disposition made of the interest owned by Nebarez.

The parties stipulated that Juan Nebarez was *legally adjudged* insane by the County Court of Kent County, Texas, on July 21, 1933, and remained insane until he was legally adjudged sane by the same court on May 30, 1950. The majority

opinion holds that the 1944 deed vested title in the respondents. This would be correct if you assume that no guardian was appointed for Juan Nebarez. A deed of an insane person is merely voidable, where no guardian has been appointed, and can only be attacked by the person at whose instance it is voidable. A different rule obtains, however, with respect to the contracts of a person who has been placed under guardianship pursuant to a valid judgment of insanity. If a guardianship of the estate of Juan Nebarez was pending and active when Nebarez executed the deed in 1944, such attempted conveyance was void. In that event, the ward has lost control of his estate and the property was within the jurisdiction and under the control of the probate court on the date of the 1944 deed. 24 Tex. Jur. 381; Baldwin v. Davis Hill Oil Co., 245 S.W. 2d 353, 362. See also Elston v. Jasper, 45 Texas 409, 21 T. L. R. 576.

The record in this case presents a situation where Rules 434 and 505, T. R. C. P. should be applied. As said by this Court in the case of London Terrace v. McAlister, 142 Texas 608, 180 S.W. 2d 619, "our appellate courts exercise a generous discretion in remanding cases after reversal * * * Our decisions show that causes have been remanded after a reversal rather than rendered, when the case was tried on the wrong theory, when the evidence was not fully developed, * * * or when it seemed probable that the ends of justice would be better subserved thereby."

Under Rule 434, Vernon's Texas Rules of Civil Procedure, the Court of Civil Appeals shall remand the case for a new trial only when "it is necessary that some matter of fact be ascertained or the damage to be assessed or the matter to be decreed is uncertain." Rule 505 provides that the Supreme Court shall "* * * reverse the judgment and remand the case to the lower court, if it shall appear that the justice of the case demands another trial."

It was held in the case of London Terrace v. McAllister, supra, and also in the case of Williams v. Safety Casualty Co., 129 Texas 184, 102 S.W. 2d 178, that the above quoted phrases from Rules 434 and 505 mean the same.

For the reasons stated, the judgments of the trial court and the Court of Civil Appeals should be reversed and rendered in favor of petitioner as to the one-half interest in the land owned by the children of Juan Nebarez, and be reversed and

remanded to the trial court as to the one-half interest owned by Juan Nebarez to ascertain whether or not an active guardianship was in effect at the time of his conveyance in 1944.

Opinion delivered October 15, 1952.