**INSURANCE COMPANY OF NORTH AMERICA, Appellant,**

v.

**Jay B. STROBURG, Appellee.**

No. 11748.

Court of Civil Appeals of Texas, Austin.

June 17, 1970.

Rehearing Denied June 17, 1970.

Clark, Thomas, Harris, Denius & Winters, E. Barham Bratton, Barry Bishop, Austin, for appellant.

Jones, Blakeslee, Minton, Burton & Fitzgerald, John L. Foster, Bill Fitzgerald, Austin, for appellee.

O'QUINN, Associate Justice.

The issue in this case is whether the evidence supports the findings of the jury that the death of John B. Stroburg, Jr., resulted, directly and independently of all other causes, from bodily injuries caused by accident.

The accident suffered by the deceased occurred on a public street in Austin, Texas, in January, 1968, when the automobile Stroburg was driving ran into a service station and struck a steel pole. Stroburg incurred serious and extensive bodily injuries in the collision, including several broken bones and major internal injuries, and died twenty-six days later, on February 22, 1968.

Jay B. Stroburg, son of the deceased, was the beneficiary of a policy of insur-

ance issued by appellant insurance company under which deceased was insured against bodily injuries, including death, caused by accident. After his father's death, appellee brought suit for the principal sum of the policy, in the amount of $20,000, and in addition sued for statutory penalties and attorney's fees.

The insurance policy provided payment of benefits for injury or death "resulting directly and independently of all other causes from bodily injuries caused by accident * * *"

The jury found that death resulted directly from bodily injuries caused by accident and independently of all other causes, and that neither a bleeding ulcer nor chronic emphysema, pre-existing conditions from which deceased suffered, contributed to the insured's death.

Based on the jury findings, the trial court entered judgment for the beneficiary under the policy, on November 12, 1969.

The position of appellant insurance company is that there is no evidence and insufficient evidence to support the jury findings. Appellant contends that the evidence demonstrates that a bleeding ulcer and chronic emphysema materially contributed to Stroburg's death, and that insured's death did not fall within the coverage provisions of the accident policy upon which the beneficiary brought suit.

The deceased, immediately prior to the accident, was proceeding in a northerly direction on Lamar Boulevard, a four-lane thoroughfare that is generally straight and level at the point of the collision. The Stroburg automobile left the northbound lane, crossed the two southbound lanes, and ran into a service station where it struck a six-inch steel pole. A police officer who investigated the accident found no evidence of marks indicating that Stroburg had swerved or applied brakes. The officer testified that in his experience such marks are usually found when a driver has attempted to avoid a collision. There was no evidence that another automobile was involved in any manner, nor evidence of mechanical failure. The officer found no witness to the accident.

As we have observed, the insured suffered multiple injuries in the accident and died twenty-six days later. The death certificate, which is in the record, discloses that an autopsy was performed.

Portions of the death certificate pertinent to the issue in this lawsuit are set out:

"18. CAUSE OF DEATH * * *

PART I. DEATH WAS CAUSED BY:
  IMMEDIATE CAUSE (a) Generalized peritonitis-subphrenic abscess; gastrocutaneous fistula.
  DUE TO (b) Ruptured colon, spleen, stomach & Liver
  DUE TO (c) Bleeding duodenal ulcer causing car accident

PART II. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO TERMINAL DISEASE CONDITION GIVEN IN PART I (a)

  Compound Fr mandible; Fractured pelvis; inanition; bullous emphysema, Fractured ribs; pneumothorax."

  *    *    *    *    *    *

"20b. DESCRIBE HOW INJURY OCCURRED (Enter nature of injury in Part I or Part II of Item 18)

  Bleeding ulcer led to syncope causing car wreck which caused car wreck and the multiple injuries"

Six days following death of the insured the appellee, as beneficiary of the insurance policy, filed the "Affidavit of Claimant" on appellant's form and attached a copy of the death certificate. In response to the question, "How did the accident happen? (Describe fully)", appellee stated in the affidavit: "Auto Accident— Bleeding ulcer led to blackout causing sin-

gle car accident which resulted in multiple injuries."

■ Appellant insurance company introduced at the trial the death certificate and the affidavit of claimant. The death certificate " * * * when properly certified by the State Registrar, shall be prima facie evidence in all courts * * * of the facts therein stated." Article 4477, Rule 54a, Vernon's Ann.Tex.Civ.St. (Sanitary Code of Texas, Acts 1927, 40th Leg. 1st C.S. p. 116, ch. 41, sec. 21, as amended). The statements in the certificate, without any disclaimer by appellee as beneficiary of the insurance policy, were admissible against the beneficiary as admissions by adoption. Thornell v. Missouri State Life Ins. Co., 249 S.W. 203 (Tex.Com.App., 1923); Bennett v. Romos, 151 Tex. 511, 252 S.W.2d 442 (1952); Continental Casualty Co. v. Fountain, 257 S.W.2d 338 (Tex.Civ.App., Dallas, 1953, writ refused).

■ The death certificate established a defense of death due to a bleeding ulcer that produced fainting and resulted in the car wreck in which the multiple injuries were sustained by the insured, and the further defense that bullous emphysema was a significant condition contributing to death, unless such defenses were rebutted by evidence introduced by appellee as claimant under the policy. The burden was on appellee as plaintiff in the trial court to prove by a preponderance of the evidence that the death of the insured was caused solely by accidental means, and it was not appellant's burden to disprove any part of the claimant's case. Continental Casualty Co. v. Fountain, supra, and cases cited, 257 S.W.2d 338, 345, col. 1.

If the insured died from the effects of two or more concurring causes, one of which was the accident and one or more of the other causes non-accidental, there can be no recovery under the terms of the policy. The policy coverage is limited to accidental bodily injuries that are the sole cause of death. Mutual Benefit Health and Accident Association v. Hudman, 398 S.W.2d 110 (Tex.Sup.Ct.1965).

Appellant insurance company contended at the trial that both a bleeding ulcer and chronic emphysema were contributing causes of death. Medical testimony was introduced as to both the ulcer and emphysema, establishing that each was a condition pre-existing the accident.

Dr. William S. Moskovitz, who treated the insured at Brackenridge Hospital immediately after the accident, testified as a witness for the claimant. At the time of the initial examination of insured Dr. Moskovitz determined, in a test to ascertain the relative amount of plasma and corpuscles, that Stroburg had a count of 26, whereas a normal count would be 42 to 45. Dr. Moskovitz testified that this low count of red blood cells was consistent with a history of bleeding for three to four days prior to the accident. During surgery performed on Stroburg, Dr. Moskovitz confirmed that the insured had an actively bleeding ulcer which had been bleeding several days prior to the accident. Dr. Moskovitz testified that Stroburg had a recent medical history of "tarry stools" (blood in feces) and abdominal pains prior to the accident.

Dr. Moskovitz, who filled out and signed the death certificate, testified that it was his medical opinion Stroburg's bleeding ulcer caused the insured to lose consciousness or become so weak that he could not control his car. Although Dr. Moskovitz disclaimed any first-hand knowledge as to the cause of the accident and did not recall how he obtained the information that Stroburg had fainted, he testified that from his examinations and his findings during surgery he was of the opinion, at the time he filled out the death certificate, that fainting or weakness, due to loss of blood from the bleeding ulcer, was the only reasonable medical explanation of what caused the accident. Except for the admission by Dr. Moskovitz that he had no first hand knowledge of the accident, we do not find in the record evidence rebutting the state-

ment in the death certificate that a bleeding duodenal ulcer led to fainting and caused the car wreck in which Stroburg suffered extensive bodily injuries.

Dr. A. Quadros DaSilva performed the autopsy referred to in the death certificate and testified as a witness for the appellant. Dr. DaSilva, who specializes in pathology, testified that the autopsy confirmed existence of a chronic ulcer pre-existing the accident. It was his testimony that the ulcer was still active at the time of insured's death and had continued to contribute to the inflammation and peritonitis in the abdominal area until Stroburg's death.

Dr. DaSilva testified in detail concerning the emphysema he found in the insured's lungs. Both Dr. Markovitz and Dr. DaSilva gave general testimony that emphysema is a chronic disease of the lungs that takes a long time to develop. Although Dr. Markovitz performed surgery on Stroburg a short time after the accident, he limited this operation to the abdominal cavity and did not enter the chest area because of the danger of further infection. Dr. Markovitz was not present at the autopsy and had no personal knowledge of the findings made by Dr. DaSilva in the chest area of insured.

Dr. DaSilva described Stroburg's emphysema as severe, a conclusion based on both gross and microscopic examinations. The autopsy revealed that Stroburg's left lung had collapsed, although X-ray reports showed both lungs normal thirteen days prior to death. Dr. DaSilva testified that chronic emphysema causes abnormal blister-like areas on the lungs, and the blisters, or bullae, being weak may rupture instantaneously, forming larger spaces or bullae. The rupture of these fused air sacs led to the collapse of Stroburg's left lung, Dr. DaSilva testified.

When the left lung collapsed, the doctor explained, the remaining lung, being extensively diseased also, could not carry the load. Dr. DaSilva testified:

"* * * In this case, the emphysema was severe, it was very severe, and it was bilateral, so that when one lung collapsed, the other lung was not normal, at all, to even carry half of the load, and it was more than just the usual autopsy case under the circumstances. It was very diseased pulmonary tissue, and in this case, then, it is definitely, in my opinion, contributory, the fact that he has had the emphysema in the other lung."

Additional testimony by Dr. DaSilva regarding the emphysema as a contributing factor to death is quoted:

"Q Dr. Moskovitz, who has previously testified, listed the bullous emphysema and pneumothorax as a cause contributing to Mr. Stroburg's death. In your opinion, Doctor, in all reasonable medical probability, did the ruptured emphysematous bullae and the ensuing pneumothorax contribute to Mr. Stroburg's death?

"A Yes, I believe so.

"Q That was because of his weakened condition, in addition to the fact that this type of condition can sometimes cause death in a healthy person?

"A Well, in addition to the pneumothorax, this man had several things wrong with him, like the pleural inflammation, for instance.

"Q In your opinion, the pneumothorax was caused by the ruptured emphysematous bullae, in all reasonable medical probability. Is that correct?

"A It was ruptured in this inflamed area, yes.

"Q And the pneumothorax, or the rupture of the emphysematous bullae causing the pneumothorax definitely contributed to his death?

"A Yes, I believe that."

Dr. DaSilva described the lungs of the insured as abscessed, the whole surface

"covered with pus, and there was pus in the cavity of the chest," with many of the blister-like structures, "mostly on the upper portion of the lung as is customary for these bullae to be." It was his opinion that in all reasonable medical probability the emphysematous condition of Stroburg's lung contributed to his death. Dr. DaSilva was firm under both direct and cross examination that emphysema was a contributing cause of death. This was in support of the declaration to the same effect in the death certificate.

Dr. Moskovitz testified, "as far as I can say, at the time of his death there was no other reason for his death other than the overwhelming injuries that he had received." This medical opinion is not inconsistent with and in no way rebuts the statement also made by Dr. Moskovitz that there was no reasonable medical explanation for the accident itself except fainting or weakness resulting from the bleeding ulcer. Nor does this opinion deny that the emphysema described by Dr. DaSilva was a contributing and concurring cause of death, since Dr. Moskovitz was not permitted by the trial court to give any testimony on emphysema as a cause of death because his only knowledge of this cause was gained by him from hearsay. The statement in the death certificate that "bullous emphysema" and "pneumothorax" were "significant conditions contributing to death" was corroborated by the direct testimony of Dr. DaSilva.

Recovery was denied under a similar policy of insurance in a case in which adhesions of the small intestine, resulting from surgery performed some time prior to the accidental injury (sustained while lifting farm machinery), concurred to cause a twisting of the intestine and consequent obstruction. In that case it was shown that but for the pre-existing adhesions accidental injury would not have resulted from lifting the machinery. Combined American Insurance Company v. Jordan, 403 S.W.2d 811 (Tex.Civ.App., Amarillo, 1966, writ ref. n.r.e.). In the case before use the bodily injuries Stroburg suffered would not have occurred but for the pre-existing ulcer that induced weakness, blackout, or fainting while insured was driving his automobile.

A similar policy was involved in a suit brought following a fall on a bank floor resulting in injury to plaintiff's knee. The insured had never before had any trouble with her knee, but medical testimony showed that she had pre-existing hypertrophic osteoarthritis in the injured knee. The appellate court reversed and rendered the judgment of the trial court and held that the insured's disability was not solely caused by accidental means independent of all other causes, but that two causes, the accident and osteoarthritis, concurred to cause plaintiff's disability. Great American Health & Life Ins. Co. v. Lothringer, 422 S.W.2d 543 (Tex.Civ.App., Corpus Christi, 1967, writ ref. n. r. e.).

■ It is evident that the bleeding duodenal ulcer and severe emphysema were not so remote in the scale of causation, were not so dormant and insubstantial and were not so temporary and transient that these conditions did not materially contribute to death. (Hudman, 398 S.W.2d 110, 114, col. 2). Competent evidence of the medical witnesses separated the real causes of death from mere conditions. Dr. Moskovitz gave the ulcer as the only reasonable medical explanation for the accident. Dr. DaSilva concluded that the collapsed lung, induced by chronic emphysema, together with the weakened and diseased condition of the remaining lung, definitely contributed to death after the accident.

We conclude that appellee failed to meet the burden of proving that the insured's death resulted from purely accidental means. We cannot presume that the accident was not due to sickness or ill health, for the evidence is uncontradicted that the bleeding ulcer induced weakness or fainting to cause the accident itself. Serious illness that is the cause of accidental bodily injuries cannot be disregarded in determin-

ing whether injury or death resulted from purely accidental means. Continental Casualty Co. v. Fountain, supra; American Casualty and Life Co. v. Morrison, 161 S. W.2d 796 (Tex.Civ.App., Eastland, 1942, writ dsmd.); Combined American Insurance Company v. Jordan, supra.

We find that the evidence shows that two or more causes concurred to produce death, only one being accidental bodily injury. The undisputed evidence shows that a pre-existing bleeding ulcer induced fainting or weakness to cause the accident. There was direct testimony not refuted by other direct evidence that chronic emphysema caused one lung to collapse in the hospital which created a burden the remaining diseased lung was incapable of bearing. The ulcer and chronic emphysema concurred with accidental injuries to cause death.

The insured's death does not fall within the coverage provision of the accident policy sued on, and there is no evidence to support the jury findings upon which the trial court entered judgment.

The judgment of the trial court is reversed and judgment is rendered for appellant.

Reversed and rendered for appellant.

HUGHES, Justice (dissenting).

The Court correctly states the issue in this case as being whether the evidence supports the findings of the jury that the death of John B. Stroburg, Jr., resulted, directly and independently of all other causes, from bodily injuries caused by accident. This is the language of the policy and is the substance of the jury verdict on this issue. In connection with this issue and the issues inquiring whether the ulcer or emphysema suffered by Mr. Stroburg contributed to his death the jury was instructed: "You are instructed that in connection with special issues numbers 1, 2 and 3, that death may result 'directly and independently of all other causes from bodily injuries caused by accident,' even if there exists pre-existing conditions or disorders if those pre-existing conditions or disorders are so remote in the scale of causation, so dormant and insubstantial, or so temporary and transient that they do not materially contribute to the death."

No exceptions or objections were made to the charge.

The Court, however, in its opinion, relying on the recitation in the death certificate that the bleeding ulcer of the deceased caused the car accident held that, "The death certificate established a defense of death due to a bleeding ulcer that produced fainting and resulted in the car wreck in which multiple injuries were sustained by the insured * * *." The Court further states, "The undisputed evidence shows that a pre-existing bleeding ulcer induced fainting or weakness to cause the accident. * * *" The Court thereupon concluded, as to this phase of the case, that the bleeding ulcer contributed to the cause of death.

It is my opinion that the cause of the accident is immaterial to liability under this policy. The obvious reason for this opinion is that the policy is not so conditioned. The only issue here is as the Court states, the policy provides and the jury determined, whether the injuries sustained by Mr. Stroburg in the accident were the sole cause of his death.[1]

---

1. The cited cases of American Casualty & Life Co. v. Morrison, 161 S.W.2d 796, Tex.Civ.App., Eastland, writ dismissed (1942) and Continental Casualty Company v. Fountain, 257 S.W.2d 338, Tex. Civ.App., Dallas, writ ref. (1953) are cited to sustain this holding. In Morrison the policy sued on provided, in part, "This policy insures against loss of life, limb, sight or time, resulting directly and independently of all other causes from bodily injuries sustained during any term of this policy through purely accidental means * * *." The Court stated, "* * * the statement of facts presents no evidence of bodily injury of any kind received by the insured * * *." The Court then indulged in a fanciful pyra-

The Court also holds that there is no evidence to support the jury finding that emphysema was not a contributing cause of death. The extent of the injuries sustained by Mr. Stroburg as a result of the accident and the medical treatment to which he was subjected following the accident are not fully stated in the Court's opinion and I will elaborate thereon on the theory that if Mr. Stroburg had been accidentally shot through the heart with a 45 revolver, dying instantly, the fact that he had emphysema would not have materially contributed to his death. This is not quite the case here, but it is a near approach.

When Dr. William Moskovitz, a surgeon, first saw Mr. Stroburg he was being treated by other doctors for facial lacerations and a fractured mandible (jaw bone). We quote the testimony of Dr. Moskovitz:

"Of course, by the time I saw Mr. Stroburg, I had already been told by his physician that he had vomited blood, and he had shown or told them he was having more abdominal pain; and had seen X-rays which showed that he had air under the diaphragm, which means that a hollow organ that contains air within the abdominal cavity had ruptured.

At the time, he was on the operating room table with a nasal gastric tube in place, which is a tube that is placed into his stomach through his nose, and bright red blood was coming out of this.

He had a board-like abdomen, which means that when you palpate it or examine it, it is like feeling a board, and this usually means that there is something catastrophic going on inside the abdominal cavity."

X-rays showed that Mr. Stroburg had a fractured pelvis, a fractured acetabulum (perimeter of the pelvis) and fractured ribs.

Dr. Moskovitz had a study made of Mr. Stroburg's blood in preparation for surgery at about 9:00 to 9:30 that evening. The hematocrit level at that time was found to be 26. As soon as blood was available, within an hour of Dr. Moskovitz first having seen Mr. Stroburg, surgery was begun. Upon entering the abdomen, he noted the presence of free blood. He noted that blood was coming from a one inch by three-quarter inch perforation in the stomach. Nearby this perforation he found, and ligated or sutured closed, a bleeding peptic ulcer. The perforation was a result of trauma, and was unrelated to the ulcer.

Additional internal injuries found were a lacerated liver, a laceration of the capsule of the spleen, and a rupture or tear of the large colon. All of these injuries, including the perforation of the stomach, were the result of blunt trauma to the abdomen, presumed by Dr. Moskovitz to have been suffered in the automobile accident.

Fecal matter was coming out of the ruptured colon, and Dr. Moskovitz initially used clamps to prevent further contamination of the abdominal area. He then removed the spleen, and took care of the laceration of the liver. An outside colostomy was then performed to permanently repair

---

miding of presumptions which would have to be made in order to sustain a recovery, the fourth of which presumptions was that the presumed fall of insured "was not due to sickness or ill health." This is the portion of the opinion deemed to support the Court's holding in this case that if the ulcer caused the accident, there is no liability. It was quoted with approval in Fountain, supra. In that case the language of the policy was similar to that found in Morrison. The insured suffered a broken arm in an automobile accident. He died about three months later. Two doctors, including plaintiff's, testified that insured died of cancer. Both doctors denied that the broken arm was the direct or sole cause of his death. The quotation from Morrison was to support the Court's holding against piling presumptions. The decision of the Court was that there was no evidence to support the jury verdict that the insured died solely from accidental means. In neither of these cases, I submit, did the Court hold that the cause of the accident was relevant to liability under the policies.

the rupture of the colon. The fecal material which had escaped into the body cavity had contaminated the omentum, or fat apron which covers the abdominal area, so it was removed so as to remove as much contamination as possible from the area. Since the stomach perforation was in the area of the pylorus, or junction between the stomach and the small bowel, Dr. Moskovitz peformed a pyloroplasty closure of the perforation so that the valve would continue to function. However, fearing that even with this the valve would cease to function, he performed a gastrojejunostomy, which, in other terms, supplied an alternate route in case the pylorus became blocked. Drains were installed so as to allow drainage in the area of the spleen, along the liver, under the diaphragm on both sides, and in the area of the stomach. These drains were for control of infection or leakage through the closures made.

Finally, effort was made to clean out as much of the contamination as possible through irrigation, and closure was made of the surgical wound. Mr. Stroburg was then transferred to the intensive care unit for post-operative procedures.

Dr. Moskovitz testified that this had been "extensive surgery."

After the surgery, Dr. Moskovitz testified that Mr. Stroburg "had a very stormy course, with one complication after another." Soon after, Mr. Stroburg began to hallucinate, and had high fevers and a loss of blood pressure. One of two explanations for this was the development of gram negative septicemia, an infection of the blood due to gram negative bacteria from the colon. A later blood culture showed that there were gram negative bacteria in the blood stream.

Next, a fistula developed in the area of the stomach closure, which was first controlled with the catheters installed at the time of the first surgery. Later, a second surgical procedure was performed, called a "feeding jejunostomy," by which a tube was placed into the small bowel below where the leakage was occurring so that he could be fed. From his observations during this second surgery, Dr. Moskovitz concluded that there was no bleeding from the ulcer or gastrointestinal tract after the original surgery.

Dr. Moskovitz continued to observe Mr. Stroburg until February 22, 1968, when death occurred.

As to the cause of death, he testified:

"Q When Mr. Stroburg finally died what caused his death, in your opinion, Doctor, in all reasonable medical probability?

A It is always difficult to say exactly why someone dies, because your vital functions of the heart and everything seem to be going on.

I would say that his cause of death was just the overwhelming infection and magnitude of the injuries that he received, and his body coped with it as long as he could, and then it couldn't cope with it any more, and he died. * * *

Q And you believe that the overwhelming magnitude of his injuries from the car acccident killed him?

A That is right. * * *

Q Would you state for us, Doctor, in all reasonable medical probability what caused Mr. Stroburg's death?

A The overwhelming injuries he received at the time of his accident.

Q And those include the—

A The multiple facial lacerations and the fractures, the fractured pelvis, the ruptured colon, the ruptured liver, the ruptured spleen, the ruptured stomach.

Q All right, sir, in all reasonable medical probability, Doctor, did some other illness or disease contribute to Mr. Stroberg's death?

A   As far as I can say, at the time of his death there was no other reason for his death other than the overwhelming injuries that he had received.  * * *

The cause of death is the injuries that he received.  * * *"

In determining a no evidence point, "We may consider only that evidence, if any, which, viewed in its most favorable light, supports the jury findings, and we must disregard all evidence which would lead to a contrary result." Biggers v. Continental Bus System, 157 Tex. 351, 303 S. W.2d 359 (1957).

This Court has not, in my opinion, followed this rule in this case. I would hold that the evidence, cited above, supports the jury verdict and would affirm the judgment of the Trial Court. I, therefore, respectfully dissent.